IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JIHAN OMAR, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.  24 C 11843 |
| | ) | |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| VERSANT HEALTH, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jihan Omar has sued her former employer, defendant Versant Health (a vision care company), under the Americans with Disabilities Act ("ADA") and Title VII of the Civil Rights Act of 1964 ("Title VII"). According to plaintiff, she is black and has autism, PTSD, ADHD, and depression and anxiety. She alleges that while employed with defendant, she was treated differently than her white, male, and non-disabled coworkers and was wrongly terminated. She thus asserts three counts in her complaint: a claim for discrimination under the ADA, 42 U.S.C. § 12101, et seq. (Count I); a claim for race, sex, and national origin discrimination under Title VII, 42 U.S.C. § 2000e, et seq. (Count II); and a claim for retaliation under Title VII, 42 U.S.C. § 2000e, et seq. (Count III). Defendant has filed a "partial motion to dismiss Counts I and II." For the following reasons, the court denies defendant's motion.

## BACKGROUND

Plaintiff alleges the following in her complaint. Defendant hired plaintiff—who is black and who came to the job with ten years of experience in the healthcare field—as a Project Manager in December 2021. During the onboarding process, plaintiff informed defendant that she had the following disabilities: autism, PTSD, ADHD, and depression and anxiety.

When her initial supervisor left the company in February 2022, plaintiff became the only black woman on her team. That same month, defendant hired a white woman, Karyn Entzion, as plaintiff's supervisor. In one of Entzion's first meetings, she "singled out" plaintiff—"the only woman of color" present—for "defin[ing] a word incorrectly." Plaintiff reported this to one of defendant's VPs. Entzion thereafter began to remove plaintiff from projects and "decreas[ed]" her responsibilities. Entzion also continued to "single out" plaintiff. In an email, for example, Entzion stated that plaintiff's "behavior was 'inappropriate,' that [plaintiff] wasn't 'genuine or authentic,' and that [plaintiff] 'came across as untrustworthy.'" Although Entzion knew that plaintiff was autistic—and so plaintiff "sometimes struggles to pick up on social cues, make eye contact, and communicate in a direct manner," and "some people perceive" her as "disrespectful"—Entzion continued to remark on plaintiff's "behavior and communication style."

In June 2022, Entzion left the company, and Chase Arthur, defendant's Director of Programs and Planning, became plaintiff's supervisor. That same month, a white male co-worker "used African American Vernacular English ('AAVE')" when speaking with plaintiff and "walked with a 'swagger' that appeared to be an attempt to caricature a Black person." Plaintiff told the co-worker that his conduct was racist, but Arthur, who was present and is also a White male, defended the co-worker "by telling [plaintiff] that AAVE was 'not real.'"

Thereafter, Arthur criticized plaintiff in an email to her entire team about how plaintiff handled an issue with another co-worker. He also gave her a poor review in which he criticized her "communication style and interactions with stakeholders." And after promising plaintiff that he would promote her to Senior Project Manager, Arthur instead hired a former co-worker,

2

Tricia Murray, for the position. Murray later suggested to plaintiff that plaintiff did not get the promotion because of her complaints to Arthur.

In October 2022, a white man (who was not affiliated with the company) made a "racist comment" to plaintiff in front of Arthur and her co-workers. Plaintiff confronted the man about the comment, but Arthur "laughed at the comment" and told her to stop confronting him. Plaintiff reported this incident to HR.

In December 2022, Murray referred to two black female employees as "Grinches" in an email to the leadership team. Plaintiff reported this to Arthur, and also told Murray that the comment was "tinged with racism." Thereafter, Murry began micromanaging plaintiff's work and plaintiff complained to Arthur on multiple occasions about Murray's behavior toward her. Arthur later gave plaintiff a poor review, noting that plaintiff "needed to 'improve her working relationship with . . . the senior project manager.'" (Ellipsis in original).

Plaintiff then complained to HR about how Arthur and Murray were treating her— "which [plaintiff] recognized as both racial discrimination and discrimination based on her mental disability." On February 24, 2023, HR terminated plaintiff, telling her that her position "had been eliminated due to 'budget cuts.'" And that same day, HR also terminated "the only other person of color" on plaintiff's six-employee team.

In March 2023, plaintiff "filed an EEOC charge." In October 2024, she "received a Notice of Right to Sue from the EEOC."

A month later, she filed a complaint in this court, in which she asserts three claims. In Count I, she asserts a claim for discrimination under the ADA. According to plaintiff, she "was singled out for her behavior, particularly when Ms. Entzion accused [plaintiff] of being

3

'inappropriate' and 'not genuine or authentic.'" "Instead of attempting to provide reasonable accommodations for [plaintiff]," she alleges, "she was treated differently due to her disability and faced negative repercussions at work." Defendant's "treatment" of her, "when it had full knowledge of her disability, plausibly demonstrates that [she] was discriminated against on the basis of her disability under the ADA."

Plaintiff asserts in Count II a claim for "[r]ace, [s]ex, and [n]ational origin discrimination" under Title VII. She alleges that she "was treated differently than her white, male, American-born, and non-disabled co-workers." She "recognized that she was being discriminated against based on her race and/or sex when she complained" to HR and her supervisors, and "was further marginalized, taken off projects, and then was ultimately terminated."

In Count III, plaintiff asserts a claim for retaliation under Title VII. According to plaintiff, she complained to HR and her supervisors that defendant retaliated against her "by removing her from projects and meetings, rescinding a promise to promote [her], providing negative performance reviews, and ultimately terminating [her]."

Finally, under a heading, "Exhaustion of Administrative Remedies" (all caps and emphasis removed), plaintiff asserts that she "satisfied the administrative requirements for filing her ADA and Title VII claim." That is because, she alleges, she "timely filed" her EEOC charge, received a Notice of Right to Sue, and then filed the complaint within 90 days of receiving the Notice of Right to Sue.

4

**DISCUSSION**

Defendant moves to "partially" dismiss Counts I and II. According to defendant, the court should partially dismiss Count I to the extent that it includes a "failure to accommodate" claim under the ADA because plaintiff failed to exhaust any such claim, and the court should dismiss Count II because it violates Fed. R. Civ. P. 10(b) by improperly "lumping together factually dissimilar allegations of race, sex, and national origin discrimination." The court analyzes each contention in turn.

**Count I**

Plaintiff asserts in Count I a "discrimination" claim under the ADA. In doing so, she alleges, among other things, that "[i]nstead of attempting to provide reasonable accommodations for [plaintiff], she was treated differently due to her disability and faced negative repercussions at work." Defendant argues that, to the extent that this is plaintiff's attempt to assert a "failure to accommodate" claim, the court should reject it because plaintiff failed to raise any such claim in her EEOC charge. Defendant thus contends that any such claim has not been exhausted and must be dismissed from Count I under Fed. R. Civ. P. 12(b)(6).

To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide the defendant with fair notice of a claim's basis and must be facially plausible. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. In determining whether a plaintiff has stated a facially plausible claim, "a court may consider, in addition to the allegations set forth in the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are

5

referred to in it, and information that is properly subject to judicial notice." Williamson v. Curran, 714 F.3d 432, 436 (7th Cir. 2013).

In its opening brief, defendant attaches copies of plaintiff's original EEOC charge and her later amended charge and argues that plaintiff failed to bring a "failure to accommodate" claim in either one. According to defendant, a "plaintiff must file a charge with the EEOC before bringing a federal lawsuit under the ADA." Here, defendant says, plaintiff brought a "disparate treatment" claim—not a "failure to accommodate" claim—in her amended charge. And the two claims, defendant argues, are "distinct." Because any failure to accommodate claim would fall "outside the scope of the EEOC Charges," defendant concludes, "the court should partially dismiss Count I."

Plaintiff argues in response that "[t]here is no 'failure to accommodate' box on the EEOC charge form," and "[w]hile [she] did not explicitly use the term 'failure to accommodate' in her Amended Charge, such a claim nonetheless falls within [its] scope." According to plaintiff, she must show that the "charge and the complaint describe the same conduct and involve the same defendants." She has done just that, she says, noting that she alleges in her complaint that "she informed [defendant] of her autism and the potential limitations it could cause" (like "behavior that could be perceived as impolite or disrespectful") and "that part of the treatment she received was directly related to [defendant]'s refusal to acknowledge this and to accommodate her disability."

In reply, defendant contends that plaintiff "provides no explanation for how the statements in her Charges are enough to give notice to the Defendant or the EEOC of a failure to accommodate claim." "In fact," defendant states, "Plaintiff's Response makes no mention of

6

her Charges at all." Defendant therefore once again concludes that plaintiff's complaint must be dismissed to the extent it raises a failure to accommodate claim.

The court begins by noting that, in deciding this motion, it will consider the original and amended charge that defendant has attached to its opening brief. That is because plaintiff—who has not objected to them—specifically "referred" to her "EEOC charge" in her complaint under the heading "Exhaustion of Administrative Remedies," and they are "central to [her] complaint" because, as explained further below, her "claims are defined by the Charge." Davis v. Cent. Can Co., No. 05 C 1563, 2006 WL 2255895, at *4 (N.D. Ill. Aug. 4, 2006) (considering the EEOC charge that the defendant attached to its motion to dismiss because "the Charge is referred to in the complaint" and because the "plaintiff's claims are defined by the Charge, making the Charge central to his complaint").

To bring a claim in federal court under the ADA, a plaintiff must "first file a charge with the EEOC." Rivera v. Bd. of Educ. for Twp. High Sch. Dist. #214, No. 23 CV 14977, 2024 WL 4534932, at *4 (N.D. Ill. Oct. 21, 2024). As a corollary, then, a plaintiff is generally "barred from raising a claim in the district court that had not been raised in his or her EEOC charge." Green v. Nat'l Steel Corp., Midwest Div., 197 F.3d 894, 898 (7th Cir. 1999). "This rule serves two purposes: it affords the employer some notice of the conduct underlying the employee's allegation" and it affords "the agency and the employer an opportunity to attempt conciliation without resort to the courts." Rivera, 2024 WL 4534932, at *2 (cleaned up).

But the rule is not rigid and absolute. Indeed, a plaintiff "need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in h[is] complaint." Id. (citation omitted). And a claim that was not explicitly set out in a charge may still be

7

brought in federal court when that "claim is reasonably related to one of the EEOC charges and can be expected to develop from an investigation into the charges actually raised." Green, 197 F.3d at 898. In determining whether the claim is reasonably related to the EEOC charges, "courts consider whether there is a factual relationship between them." Davis, 2006 WL 2255895, at *4. "At a minimum, the EEOC charge and the complaint must describe the same conduct and implicate the same individuals." Id.

The original charge here states that the discrimination was based on "[r]ace, [r]etaliation, [and] [s]ex." It describes the "particulars" as follows:

> I was hired by Respondent on or about December 6, 2021. My most recent position was Project Manager. During my employment, I was subjected to harassment. I complained to Respondent repeatedly. Subsequently, I was discharged on or about February 24[,] 2022. I believe I have been discrimination [sic] against because of my race and sex, Black female, and in retaliation for engaging in protected activity, in violation of [Title VII].

The amended charge is broader. It indicates (based on checked check-boxes) that the "cause of discrimination [was] based on" race, sex, national origin, disability, and retaliation. As for the "particulars," it states:

> I was hired by Respondent on or about December 6, 2021. My most recent position was Project Manager. During my employment, I was subjected to discrimination, harassment, and retaliation. I complained to Respondent repeatedly. Subsequently, I was discharged on or about February 24, 2023. I believe I have been discriminated against and harassed because of my sex, female, my race, Black, my national origin, and my disabilities. I believe I have been retaliated against for engaging in protected activity. These actions violate [Title VII], and the [ADA].

Under the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (emphasis added). The term "discriminate"

8

in the ADA encompasses both "disparate treatment" and "failing to provide a reasonable accommodation." Love v. First Transit, Inc., No. 16-CV-2208, 2017 WL 1022191, at *4 (N.D. Ill. Mar. 16, 2017) (citation omitted). Put another way: "An employee may state a claim for discrimination under the ADA by advancing either (1) a failure to accommodate theory—that is, the employer failed to provide a reasonable accommodation for the employee's disability—or (2) a 'disparate treatment' theory—that is, the employer treated the employee differently *because of* her disability." Id. at *2 (emphasis in original).

At the same time, the Seventh Circuit has made clear that "a failure to accommodate claim is separate and distinct from a claim of discriminatory treatment under the ADA." Green, 197 F.3d at 898. In Green, for example, the plaintiff had been injured in a car accident that left her with certain disabilities, about which she told the defendant employer. Id. at 895. The employer eventually fired her (for what it says were legitimate reasons). Id. at 896-97. She then filed a claim in federal court under the ADA alleging that the employer both, (1) terminated her based on her disability, and (2) failed to accommodate her disability. Id. at 897. The district court granted summary judgment for the employer on her failure to accommodate claim because she failed to assert it in the EEOC charge. Id. The Seventh Circuit affirmed. Id. at 900.

In doing so, it explained that the plaintiff's ADA claim alleged that the employer failed to provide her with a "suitable desk chair," "appropriate dimmer lighting," and a handicap parking spot to accommodate her disabilities. Id. at 898. But, the court pointed out, in her EEOC charge, she had alleged "only that she was terminated because of her disability." Id. at 897. The court explained that "a failure to accommodate claim is separate and distinct from a claim of

9

discriminatory treatment under the ADA," that "they are not like or reasonably related to one another," and that "one cannot expect a failure to accommodate claim to develop from an investigation into a claim that an employee was terminated because of a disability." Id. at 898. Ultimately, the Seventh Circuit "fail[ed] to understand how [the plaintiff] could expect that her claim that she suffered from inadequate working conditions would develop from the investigation of the reasons for her discharge," as that claim "has nothing to do with her complaint that she was wrongfully terminated." Id.

The Green court's "separate and distinct" and "not like or reasonably related" language could potentially be read to mean that a disparate-treatment claim is per se incapable of supporting a failure to accommodate claim. But "courts in this district do not necessarily read Green" that way. Rivera, 2024 WL 4534932, at *4. On the contrary, "[s]everal courts in this circuit have interpreted Green not to state a bright-line rule that failure to accommodate claims can *never* be 'reasonably related' to a disability discrimination claim stated in an EEOC charge." Love, 2017 WL 1022191, at *3 (emphasis in original). The "distinction" that courts generally "draw[ ] is whether the conduct underlying the discrimination charge had something to do with the underlying accommodation claim"—that is, whether "the failure to accommodate was directly related to the alleged discriminatory act, such that they [are] like or reasonably related to the allegations in the EEOC charge." Rivera, 2024 WL 4534932, at *4 (cleaned up).

Here, the court is unprepared to say at this juncture—on a motion to dismiss—that plaintiff's failure to accommodate theory is not reasonably related to the amended charge and could not reasonably be expected to have developed from an investigation into that charge. In her complaint, plaintiff alleges that although she informed defendant of her autism, her

10

supervisors "singled" her out, criticized her, and poorly reviewed her—all based on her "communication style and interactions with stakeholders." In her amended charge, she alleged that "[d]uring [her] employment, [she] was subjected to discrimination, harassment, and retaliation" and was "discriminated against and harassed because of . . . [her] disabilities."

Defendant concedes that this was enough for plaintiff to have "brought a disparate treatment claim under the ADA in her Amended Charge." Yet it fails to explain why the same allegations were insufficient for plaintiff to have also brought a failure to accommodate claim. As plaintiff notes, there was no "failure to accommodate" check-box for her to check on the EEOC charge form. See King v. HEI/Hotel Chi. Downtown Autograph Collection, No. 20 C 1283, 2020 WL 7771139, at *3 (N.D. Ill. Dec. 29, 2020) ("It is also noteworthy that despite established caselaw holding that discrimination and accommodation claims are distinct types of claims, the EEOC form still contains no check-box for claims of failure to accommodate."). And she alleged in the amended charge that "during her employment" she was "discriminated" against based on her "disabilities." Again, "discriminate" in the ADA includes both disparate treatment and a failure to accommodate. It is simply not unreasonable to think that the amended charge and the failure to accommodate claim would implicate the same conduct and individuals, or that a failure to accommodate claim would develop from an investigation of the amended charge.

Indeed, these are precisely the type of allegations that courts have found to be sufficient in denying motions to dismiss accommodations claims for falling outside the scope of the charge. See King, 2020 WL 7771139, at *1-3 (the plaintiff alleged in its amended charge that "[d]uring [her] employment, [she] was subjected to harassment by [her] supervisor and

11

discipline[d]," and that she "believe[d] [she] ha[d] been discriminated against because of [her] disability"); Dibelka v. Repro Graphics, Inc, No. 14 C 3190, 2014 WL 5858553, at *1-3 (N.D. Ill. Nov. 12, 2014) (the plaintiff stated in his charge that the employer was "aware of [his] disability," that the employer "discharged" him, and that he "believe[d] [he] ha[d] been discriminated against because of [his] disability"). They are not, by contrast, like those in Green (which was decided on summary judgment), where the plaintiff alleged in her charge "only that she was terminated because of her disability," and then later complained in court about her treatment <u>during</u> her employment. 197 F.3d at 897-98; see also Burke v. Ethyl Petroleum Additives, Inc., 359 F. Supp. 2d 726, 728 & 730 (S.D. Ill. 2005) (dismissing accommodation claim where the plaintiff's charge focused on his belief that he was "discriminated against in regard to [his] . . . discharge").

In short, while "further development of the record may prove that [plaintiff's] accommodation claim is unrelated to [her] claim of [disparate treatment], [d]efendant's motion to dismiss [Count I's] failure to accommodate claim as outside the scope of the EEOC charge is denied at this juncture without prejudice." Quinn v. Chicago Transit Auth., No. 17 C 3011, 2018 WL 4282598, at *5 (N.D. Ill. Sept. 7, 2018) (cleaned up); see also Dibelka, 2014 WL 5858553, at *3 (noting that "[f]urther development of the record may prove that Dibelka's accommodation . . . claim[ ] [is] unrelated to his claim of disability discrimination").

## Count II

Plaintiff asserts in Count II a claim for "[r]ace, [s]ex, and [n]ational origin discrimination" under Title VII. Defendant argues that Count II should be dismissed because it violates Rule 10(b) by "lumping together factually dissimilar allegations." Plaintiff contends in

12

response that Count II does not violate Rule 10(b) because "Count II is not unintelligible" and has given defendant "full notice of all the claims." "Alternatively, she seeks leave to replead and includes a draft Amended Complaint" that she attaches to her response brief. In reply, defendant argues that plaintiff is wrong about Count II complying with Rule 10(b), but that it "does not oppose [plaintiff's] request [for leave] to the extent it bears on the race/sex/national origin counts." But, defendant says, it "does oppose the request to the extent Plaintiff is trying to further plead the failure to accommodate claim that is outside the scope of her Charges." Defendant thus "requests that the Court issue a ruling on the Motion to Dismiss prior to permitting an amended complaint, since there is a need for clarity as to whether Count I includes failure to accommodate."

Because the court has now provided "clarity" on the accommodation issue, and because defendant has no other objections to the proposed amended complaint, the court denies defendant's motion to dismiss Count II, and grants plaintiff leave to file the proposed amended complaint that she attached to her response.

## CONCLUSION

For the above reasons, the court denies defendant Versant Health's "Partial Motion to Dismiss Counts I and II of Plaintiff's Complaint" [Doc. 9]. The court further grants plaintiff leave to file the proposed amended complaint that she attached to her response. Plaintiff is directed to file her amended complaint as a separate document on or before June 13, 2025. Defendant is directed to answer the amended complaint on or before August 1, 2025. The parties are directed to file a joint status report using this court's form on or before August 11,

2025.

    So ordered.

                                     **ENTER:**

                                       **Robert W. Gettleman**
                                       **United States District Judge**

**DATE:**    **June 11, 2025**

14